UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

TRISHAUNA WALSH on behalf of S.J.W.,

                              Plaintiff,

                                                12-cv-00933
              v.                                (WGY)

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

                              Defendant.[1]

_____

WILLIAM G. YOUNG, United States District Judge[2]

**DECISION and ORDER**

I.   **INTRODUCTION**

      Trishauna Walsh ("Walsh") brings this action on behalf of

S.J.W.,[3] her minor son, pursuant to 42 U.S.C. § 405(g).  Walsh

seeks judicial review of the final decision of the Commissioner

of Social Security (the "Commissioner") to deny S.J.W.'s

_____

      [1] Michael J. Astrue, the former Commissioner of the Social
Security Administration, was the original named defendant in
this matter.  Compl., ECF No. 1.  On February 14, 2013, Carolyn
W. Colvin became the Acting Commissioner of Social Security.
Clerk's Notes, May 21, 2013.  Pursuant to Federal Rule of Civil
Procedure 25(d), she has been substituted as the named
defendant.  Fed. R. Civ. P. 25(d).

      [2] Of the District of Massachusetts, sitting by designation.
ECF No. 13.

      [3] Because S.J.W. is a minor, the parties and the Court refer
to him by his initials.  See Fed. R. Civ. P. 5.2(a).

1

application for Supplemental Security Income benefits ("SSI"). Compl. ¶¶ 1, 7, ECF No. 1. Walsh challenges the decision of an Administrative Law Judge (the "hearing officer") that S.J.W. was not disabled within the meaning of 42 U.S.C. § 1382c(a)(3)(C). Admin. R. 55, ECF No. 8.

### A. Procedural Posture

On December 10, 2009, Walsh applied for SSI on S.J.W.'s behalf. Admin. R. 122. Walsh indicated that S.J.W.'s disability began on November 25, 2009. Id. On March 8, 2010, the Regional Commissioner determined that S.J.W. did not qualify for SSI because he was not disabled. Id. at 85-87. Walsh filed a request for a hearing before a hearing officer on or about March 12, 2010. Id. at 91. On January 25, 2011, Walsh and S.J.W. appeared before the hearing officer. Id. at 61-66. After the hearing officer asked Walsh if she would like a postponement to obtain counsel, Walsh requested a postponement. Id. at 64. Walsh, now represented by counsel, appeared before the hearing officer a second time on March 30, 2011. Id. at 68. Walsh was examined by the hearing officer on this date, id. at 72-77, and the hearing officer left the record open for ten days to receive additional documentation from S.J.W.'s pediatrician, id. at 72, 82. On April 25, 2011, the hearing officer issued a decision finding that S.J.W. was not disabled. Id. at 55. Walsh appealed the hearing officer's decision to the Social

2

Security Administration's Appeals Council ("Appeals Council") in June 2011, id. at 35-36, and on April 3, 2012, the Appeals Council denied Walsh's request for review, id. at 1. Walsh filed this action for review of the Commissioner's decision in this Court on June 8, 2012.[4] Compl.

## B. Factual Background[5]

S.J.W. is currently a nine-year old boy who lives with his mother, Walsh, and two older brothers. Admin. R. 43, 72-73. When Walsh applied for SSI on her son's behalf, he was five-years old. Id. at 122. At birth, S.J.W. failed his initial hearing screening and later evaluations of his hearing confirmed that he had hearing loss. Id. at 332. S.J.W.'s hearing loss is variously described in the record as "mild to moderate," id.,

---

[4] An individual requesting review of the Commissioner's final decision must commence a civil action "within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). Regulations, however, provide that the sixty day period for filing an action begins when the individual receives notice of the Appeals Council's action. 20 C.F.R. § 422.210(c). With her complaint, Walsh has attached a copy of the Appeals Council's notice that was mailed to her; the copy of the notice has a date stamp indicating that her attorney's office received it on April 10, 2012. Compl. at 32. Walsh filed this action on June 8, 2012. Compl. Therefore, Walsh timely commenced this action fifty-nine days after she received notice of the Commissioner's final decision. The Commissioner does not contest the timeliness of Walsh's filing. See Answer ¶¶ 6, 10, ECF No. 7.

[5] Additional evidence of S.J.W.'s limitations is found in the administrative record. For the sake of readability, the Court highlights only the most salient pieces of evidence.

"[m]oderately severe," id. at 286, and "profound," id. at 299. Because of his hearing loss, S.J.W. wears hearing aids in both ears. Id. at 207. His teachers use an FM system to assist his hearing. Id.

### 1. Early Intervention Program

S.J.W. was referred to the Saratoga County Early Intervention Program ("EIP") because of Walsh's concerns about his speech development. Id. at 332. On July 11, 2006, when he was twenty months old, he was evaluated by a three-member team from "Early Start," an organization which provides speech language therapy services. Id. at 332-36. The team reported that S.J.W. was not yet using verbalizations to meet his needs and wants, and that he was unable to follow simple directions without visual cues. See id. at 335. They also assessed S.J.W.'s communication skills through two tests, the Preschool Language Scale-3 ("PLS-3") and the communication DAYC sub-test. Id. S.J.W.'s score on the PLS-3 indicated his language age was equivalent to a fourteen month old, and his score on the DAYC communication sub-test indicated that his performance was equivalent to a twelve month old. Id. The Early Start team concluded that he had a thirty-three percent delay in his communication skills. Id. at 336.

As a result of their evaluation, the Early Start team concluded that S.J.W. was eligible for EIP services. Id. He

received a variety of services through the EIP, including speech therapy twice a week and teaching for the hearing impaired. <u>See</u> <u>id.</u> at 314. At some point prior to S.J.W.'s hearing on March 30, 2011, he stopped receiving EIP services, although he appears to have received other support services from the school through other programs. <u>Id.</u> at 77-78.

### 2. Treating Sources or Potential Treating Sources

#### a. Dr. Merecki

Since just after birth, S.J.W.'s pediatrician has been Dr. Eugene Merecki ("Dr. Merecki"). <u>Id.</u> at 76, 260. The Commissioner received two submissions from Dr. Merecki. The first was an evaluation form Dr. Merecki completed on January 6, 2010, at the request of the New York State Office of Temporary and Disability Assistance ("NYOTDA"). <u>Id.</u> at 275-79. On this form, Dr. Merecki indicated that S.J.W. has had moderate bilateral hearing loss since birth and a delayed speech pattern. <u>Id.</u> at 275. Dr. Merecki also wrote that S.J.W. has temper tantrums "out of frustration with not being able to hear (understand)." <u>Id.</u> at 277. Likewise, Dr. Merecki described S.J.W.'s emotional, communication, and sensory skills as "delayed." <u>Id.</u> at 278. He opined, however, that S.J.W.'s cognitive and motor skills were "age appropriate." <u>Id.</u> at 277-78. Dr. Merecki also completed a second form to evaluate S.J.W.'s areas of functioning on March 29, 2010. <u>Id.</u> at 299.

On this form, Dr. Merecki indicated that S.J.W. had a "mild" cognitive limitation and "marked" limitations in both his social skills, i.e. in his ability to "interact[] and relat[e] with others" and in his overall health and physical well-being. Id. Dr. Merecki explained that S.J.W.'s social limitations and poor physical well-being stemmed from a "[d]elay in communication due to profound hearing loss."[6]  Id.

### b.  Ms. Guerin, M.S. CCC-SLP

At the time the hearing officer heard the relevant evidence, S.J.W. was receiving speech and language therapy three times a week at his elementary school. Id. at 215, 253. He was also recieving services from a teacher for the deaf and hard of hearing. Id. at 221. At the time, his speech pathologist was Alison Guerin, M.S. CCC-SLP ("Ms. Guerin"). Id. at 214-15. Ms. Guerin conducted a speech and language evaluation of S.J.W. on October 7, 2010. Id. at 214. In her evaluative report, Ms. Guerin described S.J.W. as "friendly" and "cooperative," and

---

[6] Walsh was examined by the hearing officer on March 30, 2011. Admin. R. 70. After Walsh's examination, the hearing officer left the record open for ten days to receive additional records from Dr. Merecki. Id. at 72. The second evaluation form appears to have been such additional document. It is unclear precisely when the second evaluation form was received by the Commissioner, although there is a fax header on the document dated April 4, 2011. Id. at 299. The Commissioner does not dispute that this document was a part of the record available to the hearing officer when the agency issued its decision. See Mem. Law Supp. Comm'r's Mot. J. Pleadings 10, ECF No. 12.

stated that although his speech articulation skills are "below average" for his age and gender, he had made some improvement in his sound production. Id. at 215-17. Ms. Guerin conducted a number of tests to assess S.J.W.'s vocabulary and language ability. Id. at 216-18. On some of the tests, S.J.W. scored at the "low average," "average," or even "above average" performance level. Id. at 216-17. S.J.W.'s performance, however, was worse on the majority of the tests Ms. Guerin conducted, which usually placed him at the "below average" level. Id. For instance, on an evaluation of general language ability, the Clinical Evaluation of Language Fundamentals-4 ("CLEF-4"), S.J.W. scored in the second percentile on three subtests, namely "Concepts and Following Directions," "Recalling Sentences," and "Expressive Vocabulary." Id. Likewise, he scored in the fifth percentile on the Peabody Picture Vocabulary Test-4 ("PPVT-4") and in the eighth percentile on the Goldman Fristoe Test of Articulation-2 ("GFTA-2"). Id.

In her evaluation, Ms. Guerin noted that while S.J.W. was "able to identify common nouns and verbs," he had difficulty identifying uncommon and more abstract nouns. Id. at 216. He also "missed special and temporal concepts" such as "between," "before," and "after." Id. at 217. Although S.J.W. had little difficulty identifying the relationships between pictures which Ms. Guerin showed to him, "[h]e demonstrated difficulty" in

explaining the relationship.  Id.  By way of example, Ms. Guerin noted that while S.J.W. was able to determine that there was a relationship between a letter and a stamp, when she asked him what the relationship was, he said "notes."  Id.  Ms. Guerin explained that S.J.W.'s "receptive language skills (what he understands) [were] considerably higher than his expressive language skills (what he says)."  Id.  Nevertheless, she concluded that, overall, both his expressive and receptive language skills were "below average for his age."  Id. at 218.

S.J.W.'s test results also led Ms. Guerin to the conclusion that he "demonstrated significant difficulty following directions," id. at 217, and at times "needed to be redirected and reminded to maintain his attention to the task at hand," id. at 218.  Ms. Guerin did relate, however, that S.J.W. was "easily redirected" when off track and was hard working and cooperative. Id.

### 3.  Other Evidence in the Record

#### a.  Grasso-Megyeri's Assessment

NYOTDA also referred S.J.W. to Dawn Grasso-Megyeri, M.S. CCC-SLP ("Ms. Grasso-Megyeri"), for a speech and language assessment, which was completed on February 9, 2010.  Id. at 282.  Ms. Grasso-Megyeri stated in her evaluation that the parameters of S.J.W.'s voice, i.e., "pitch, quality, intensity, and rate," were appropriate and observed that "[i]n a quiet

setting, with his hearing aids on, [S.J.W.] was able to respond appropriately through audition only." Id. at 283. She administered the Preschool Language Scale-4 ("PLS-4") test and the GFTA-2. Id. at 283-84. S.J.W.'s total language score on the PLS-4 placed him in the twenty-first percentile, which indicated that his "expressive and receptive language skills [were] developing within normal limits." Id. at 283-84. On the GFTA-2, S.J.W.'s score was in the twenty-sixth percentile, id. at 284, which was higher than the score obtained in Ms. Guerin's subsequent administration of the test, id. at 217. Ms. Grasso-Megyeri also reported that S.J.W.'s pragmatic language skills were age appropriate and that "[b]oth in and out of context, [S.J.W.'s] speech intelligibility was considered very good at [ninety-five] percent of the time." Id. at 284. She diagnosed S.J.W. with a "[m]ild articulation delay." Id. at 285. Ms. Grasso-Megyeri concluded that S.J.W. "was able to communicate effectively" and that his test results indicated that his "expressive and receptive language skills . . . are developing within normal limits." Id. at 284-85. She judged his prognosis to be "good" and recommended that he stop receiving speech and language therapy, although she "strongly recommended" that he continue to receive audiological care. Id. at 285. Ms. Grasso-Megyeri indicated that S.J.W. was "cooperative and attentive" during the test she administered. Id. at 284.

### b.  Dr. Cevera's Evaluation

On February 23, 2010, at NYOTDA's request, Dr. John Cevera ("Dr. Cevera") evaluated S.J.W.  Id. at 286-87.  Dr. Cevera submitted a brief report, in which he stated that S.J.W. was "a pleasant young boy who communicates well in no distress."  Id. at 286.  Dr. Cevera reviewed an audiogram of S.J.W.'s hearing and concluded that he suffered from "[m]oderately severe symmetric [hearing] loss."  Id.  Dr. Cevera noted that S.J.W. experienced some improvement in his hearing because of his hearing aids.  Id.  An audiogram of the tests conducted by an audiologist in Dr. Cevera's office was added to the administrative record.  Id. at 288-89.

### c.  Dr. Fuhrman's Evaluation

On March 4, 2010, Dr. Fuhrman evaluated evidence in S.J.W.'s case at the request of the NYOTDA.[7]  Id. at 290-97.  Dr. Fuhrman marked a box on an evaluation form to indicate that in his opinion, S.J.W. had a "severe" impairment, but that S.J.W.'s impairment did not meet or medically or functionally equal the listed impairments in 20 C.F.R. § 416.924.  Id. at 292.  Dr. Fuhrman also indicated that S.J.W.'s limitation in the domain of "acquiring and using information" was "less than marked."  Id. at 294.  Likewise, he concluded that despite the fact that S.J.W. at times needed directions to be repeated to him, his

_____

[7] Dr. Fuhrman's first name does not appear in the record.

limitation in the domain of "attending and completing tasks" was also less than marked.  Id.  Dr. Fuhrman opined that S.J.W. had no limitations in the domain of "interacting and relating with others," id., and that S.J.W. suffered from limitations that were less than marked in the domain of "health and physical well-being" because of his hearing loss, speech delay, and history of asthma, id. at 295.

### d.  Kernan's Evaluation

On October 4, 2010, Renee Kernan, M.S. ("Ms. Kernan") gave a number of additional tests to S.J.W. as part of the reevaluation process of his elementary school's Committee on Special Education.  Id. at 207-11.  Ms. Kernan is a certified school psychologist.  Id. at 211.  Ms. Kernan described S.J.W.'s personality as "outgoing and happy," although she noted that "[h]e has some moments of frustration due to his disability." Id. at 207.  S.J.W. "required prompts to stay on task and to listen to directions" and was observed to "jump[] from subject to subject" in conversation.  Id.  S.J.W. took an intelligence quotient ("IQ") test, the Wechsler Preschool and Primary Scale of Intelligence - Third Edition ("WPPSI-III").  Id. at 208. S.J.W.'s verbal intelligence quotient score ("VIQ") placed him within the borderline range, which "indicat[ed] significant difficulty with retrieving/using background knowledge to solve problems as well as difficulties in his ability to understand .

. . and express himself through oral language." Id. at 209.
Ms. Kernan wrote that S.J.W.'s low verbal IQ may have been
influenced by his overall impulsivity and difficulty hearing.
Id. at 208. His performance intelligence quotient ("PIQ") was
somewhat higher, "within the low average range." Id. at 209.
S.J.W.'s processing speed index ("PSI"), however, was within the
average range, and thus, as Ms. Kernan noted, an area of
relative strength for him. Id. His full scale intelligence
quotient, derived from a combination of his VIQ, PIQ, and PSI,
was calculated as in the upper end of the borderline range. Id.
at 212.

Ms. Kernan also gave S.J.W. the Adaptive Behavior
Assessment System - Second Edition ("ABAS-II"), which evaluated
his "ability to perform self-help skills and function
independently within the school environment." Id. at 210. This
evaluation revealed that S.J.W. has significant weakness in his
"conceptual skills" area, and that he would likely "require[]
substantially more support than other students his age." Id.
It also indicated, however, that he had "adequate skills" in the
areas of "community use, school living, health and safety, self-
care, and social skills." Id.

### e.  Audiologist Winderl

S.J.W.'s audiologist is Erin Winderl, Au.D., CCC-A ("Dr.
Winderl"). Id. at 76, 362. She has regularly evaluated

12

S.J.W.'s hearing to outfit him for hearing aids.  Id. at 357-62.

On November 23, 2010, Dr. Winderl reevaluated S.J.W.'s hearing

and observed that he suffered from "mild to moderately severe"

bilateral hearing loss.  Id. at 362.  An audiogram of this test

was added to the administrative record.  Id. at 362-63.

### f.    School Records and Teacher Questionnaire

The academic year at S.J.W.'s elementary school is divided

into three grading periods.  See id. at 234.  When the hearing

officer made his decision on the application for SSI, the record

contained a copy of S.J.W.'s first grade report card which

showed his progress for the first two grading periods of the

academic year.  Id. at 233-37.  The marks on S.J.W.'s report

card indicated that his progress was generally "below teacher

expectations" in areas involving, inter alia, reading, writing,

listening, and speaking, id. at 234, although his progress in

other areas, including handwriting, music, and social skills,

"me[t] teacher expectations," id. at 234-36.  For the second

grading period, S.J.W.'s classroom teacher commented that S.J.W.

found first grade challenging, but that he had "a positive

attitude and works hard."  Id. at 237.  According to the

teacher, he had made friends in his class, but "had difficulty

in completing independent tasks."  Id.  S.J.W.'s Academic

Intervention Services teacher, Holly Rummel-Jackson ("Ms.

Rummel-Jackson"), indicated that in the second grading period he

was meeting expectations in various reading activities.  Id. at 238.  In S.J.W.'s evaluation for that same grading period, another teacher wrote that S.J.W. would benefit from using sign language more to help with his communication difficulties, noting that he was very responsive to sign language in a one-on-one setting.  Id. at 232.  In a related vein, Kathy Hyndman, S.J.W.'s teacher for the deaf and hard of hearing, recommended increasing the amount of deaf and hard of hearing services he received.[8]  Id. at 253.

On January 8, 2010, at NYOTDA's request, S.J.W.'s kindergarten teacher, Kristin Scott ("Ms. Scott") completed a questionnaire about S.J.W.  Id. at 160-69.  Ms. Scott's evaluation of S.J.W.'s abilities was generally more positive than those of his treating sources.  Ms. Scott wrote that S.J.W. was a "very sweet little boy" who "work[ed] very hard in school."  Id. at 167.  She described his reading level as "low average" and his written language and math level as "average." Id. at 160.  Ms. Scott observed that S.J.W. had problems in the domain of acquiring and using information.  Id. at 161.  On the questionnaire, for this domain, she rated him as having an

---

[8] S.J.W. completed first grade after the hearing officer issued his decision.  While his case was pending before the Appeals Council, his attorney added a copy of his complete first grade report card to the record.  See Admin. R. 15-19.  S.J.W.'s marks for the third grading period were generally consistent with his marks in the second period.  See id.

"obvious problem" in comprehending oral instructions and as having a "slight problem" in "understanding school and content vocabulary, reading and comprehending written material, understanding and participating in class discussions, expressing ideas in written form, and recalling and applying previously learned material." Id. In all other activities in this domain, Ms. Scott observed that he had no problems. Id. Ms. Scott also opined that S.J.W. had problems in the domain of attending and completing tasks. Id. at 162. She viewed S.J.W. as only having a "slight problem" in two activities falling within this domain, specifically those of "refocusing on task when necessary" and "carrying out multi-step instructions." Id. For all other activities involving attending and completing tasks, Ms. Scott noted that S.J.W. had no issues. Id. Further, Ms. Scott opined that S.J.W. had no problems interacting and relating with others. Id. at 163-64. She also wrote that she could understand almost all of S.J.W.'s speech on both known and unknown topics of conversation. Id. at 164.

### g. Walsh's Testimony

Walsh testified about S.J.W.'s difficulties at the March 30, 2011, hearing.[9] Id. at 68-82. She explained that because of S.J.W.'s hearing loss and speech delays he "struggles in

---

[9] The hearing officer attempted to question S.J.W. as well, but S.J.W. was unresponsive. Admin. R. 82.

school." Id. at 73. Walsh stated that S.J.W. had the most difficulty in math and that he was "struggling" in spelling, but noted that he was "finally doing better" in reading at school. Id. at 78. Walsh was somewhat uncertain about S.J.W.'s academic program during her testimony. She referred to S.J.W. as being in "special ed.," id. at 72; see also id. at 77, yet simultaneously described him as attending a "[r]egular school with a lot of services," id. at 72. Walsh later explained, however, that S.J.W. is frequently pulled out of his classroom for services like occupational and speech therapy. Id. at 75–76. She admitted that she herself was unclear about exactly what educational services S.J.W. received at school, explaining that "I don't understand all of [S.J.W.'s IEP],[10] it's kind of new to me." Id. at 76.

Walsh acknowledged that S.J.W. was able to hear when he wears his hearing aids. Id. at 74. She also indicated that she could usually understand S.J.W.'s speech, but that "he says a

---

[10] An "IEP" is an "Individualized Education Program." 20 U.S.C. § 1414(d)(1)(A). IEP's are created for students considered to be "disabled" under the Individuals with Disabilities Education Act. See id. §§ 1401(3)(A), 1414(d)(1)(A). IEP's are comprehensive documents containing, inter alia, "a statement of the child's present levels of academic achievement and functional performance," "a statement of the special education and related services and supplementary aids and services . . . to be provided to the child," and "a statement of any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the child on State and districtwide assessments." Id. § 1414(d)(1)(A).

lot of words wrong because he hears them wrong." Id. at 75.

Additionally, Walsh testified to S.J.W.'s difficulty in paying
attention and completing tasks without prompting. Id. at 78-79.

Walsh emphasized S.J.W.'s social challenges in her
testimony. According to her, S.J.W. experiences "a lot of
frustrations interacting with other children because either he
can't understand them or they can't understand him." Id. at 74.
Specifically, Walsh claimed that S.J.W.'s communication
difficulties led to hostility between him and his brothers, see
id. at 76, and friction with other children on the school bus,
id. at 73-74. Although Walsh acknowledged that S.J.W. had
friends at his school, she testified that he had no friends in
his neighborhood. Id. at 79.

## II. LEGAL STANDARDS

### A. Standard of Review

A district court reviewing a decision of the Commissioner
to deny social security disability benefits must make two
inquiries. The court must first determine whether the
Commissioner applied the correct legal standards to an
application for benefits and then must decide whether the
Commissioner's findings of fact are supported by substantial
evidence. Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009)
(citing Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008)).
"Substantial evidence" is defined as "such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (quoting Richardson v. Perales, 401 U.S. 389, 401 (1971)). Substantial evidence is "more than a mere scintilla" of evidence. Brault v. Social Sec. Comm'r., 683 F.3d 443, 447 (2d Cir. 2012) (quoting Moran, 569 F.3d at 112). When reviewing a hearing officer's decision, a district court must "consider[] the whole record," because "an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988) (citing Universal Camera Corp. v. National Labor Relations Bd., 340 U.S. 474, 488 (1951)).

For the Court to be able to determine whether substantial evidence supports the Commissioner's decision, the hearing officer "must set forth the crucial factors justifying his findings with sufficient specificity" to allow for review. Gravel v. Barnhart, 360 F. Supp. 2d 442, 444-45 (N.D.N.Y. 2005) (Sharpe, J.) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). Although a district court's review of a hearing officer's factfinding is highly deferential, Brault, 683 F.3d at 448, "where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards, even if the ultimate decision may be arguabl[y] supported by substantial evidence, the Commissioner's decision may not be affirmed,"

<u>Martone</u> v. <u>Apfel</u>, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (Hurd,

J.) (citing <u>Johnson</u> v. <u>Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987)).

**B.    Social Security Disability Standard**

An individual less than eighteen years old is considered to

be disabled if he "has a medically determinable physical or

mental impairment, which results in marked and severe functional

limitations, and which can be expected to result in death or

which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. §

1382c(a)(3)(C)(i).  No individual less than eighteen-years old,

however, who "engages in substantial gainful activity . . . may

be considered disabled."  <u>Id.</u> § 1382c(a)(3)(C)(ii).

The Commissioner has established a three-step process for

determining whether a child less than eighteen years old is

disabled.  <u>See</u> 20 C.F.R. § 416.924(a).  First, the Commissioner

must determine whether a child claimant is engaged in

substantial gainful activity.  <u>Id.</u>  If the child is engaged in

substantial gainful activity, he is not disabled.  <u>Id.</u>  Second,

the Commissioner must determine whether the child has a severe

impairment or a combination of impairments considered severe.

<u>Id.</u>  If the child does not have an impairment or a combination

of impairments considered severe, he is not disabled.  <u>Id.</u>

Third, the Commissioner must determine whether the child's

impairment or combination of impairments "meets, medically

equals, or functionally equals" a listed impairment.  Id.  If
the child's impairment or combination of impairments does not
meet or medically or functionally equal a listed impairment, he
is not disabled.[11]  Id.; see also id. § 416.925(a)-(c) (laying
out criteria for how impairment listings are organized and
used).  The Commissioner will find a child to be disabled when
he has met the requirements at each of the three steps described
above.  See id. § 416.924(a)-(d).

There are three separate ways by which a claimant may
establish that his impairment is medically equivalent to a
listed impairment.  20 C.F.R. § 416.926(b).  First, a claimant
who has an impairment described in the listed impairments, but
"do[es] not exhibit one or more findings specified in the
particular listing, or . . . [does] exhibit all of the findings,
but one or more of the findings is not as severe as specified in
the particular listing," may establish medical equivalence by
demonstrating other findings related to his impairment "that are
at least of equal medical significance to the required criteria"
of the listed impairment.  Id. § 416.926(b)(1).  Second, a
claimant who has an impairment not described in the listed
impairments may establish medical equivalence by demonstrating
findings related to his impairment that "are at least of equal

---

[11] The listed impairments are described in Part 404, Subpart
P, Appendix 1 of the regulations.  See 20 C.F.R. § 416.925(a).

medical significance" to those of a "closely analogous listed impairment[]."  Id. § 416.926(b)(2).  Third, a claimant who has a combination of impairments, none of which are described in the listed impairments, may establish medical equivalence by demonstrating findings related to his combination of impairments that "are at least of equal medical significance to those of a[n] [analogous] listed impairment.  Id. § 416.926(b)(3).

The Commissioner determines whether a child claimant's impairment is functionally equivalent to a listed impairment by assessing the child's functioning in six domains.  Id. § 416.926a(b)(1).  The six domains assessed by the Commissioner are: "(1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being."  Id.  The Commissioner assesses the child's functioning by comparing his performance in activities within a domain with the performance of other children of the same age without impairments.  See id. § 416.926a(b).  A child's impairment or impairments functionally equals a listing if he has "marked limitations" in two domains or an "extreme limitation" in one domain.  Id. § 416.926a(d).  A marked limitation exists when a child's impairments "interfere[] seriously with [his] ability to independently initiate, sustain, or complete activities."  Id. § 416.926a(e)(2)(i).  A "marked

limitation" is defined as "a limitation that is 'more than moderate' but 'less than extreme.'"  Id.  An "extreme limitation" exists when a child's impairment "interferes very seriously with [his] ability to independently initiate, sustain, or complete activities."  Id. § 416.926a(e)(3)(i).  "Extreme limitations" are more serious than marked limitations; only the worst limitations are considered extreme.  Id.

## III. THE HEARING OFFICER'S DECISION

The hearing officer issued a sixteen-page decision on April 25, 2011, to support his finding that S.J.W. was not disabled. Admin. R. 40-55.  The hearing officer first determined that S.J.W. had not engaged in substantial gainful activity since his application was filed.  Id. at 43.  Next, he concluded that S.J.W. suffered from a severe impairment, which he described as "moderately severe bilateral neural hearing loss."  Id.  Then, without any analysis or citations to the record, he cursorily stated that S.J.W. did not have an impairment or combination of impairments which met or medically equaled Listed Impairment 102.10, which covers hearing loss not treated with cochlear implanatation.  Id.

The hearing officer then proceeded to analyze whether S.J.W. had an impairment which functionally equaled the listings, id. at 43-55, concluding that S.J.W.'s impairment did not so equal, id. at 43.  In the hearing officer's analysis of

the six domains, he determined that S.J.W. had "less than a marked limitation" in the domains of "acquiring and using information," "attending and completing tasks," "caring for yourself," and "health and physical well-being." Id. at 46-55. The hearing officer concluded that S.J.W. had no limitations in the remaining two domains, "interacting and relating to others" and "moving about and manipulating objects." Id. at 50-53.

The hearing officer devoted several pages to analyzing S.J.W.'s limitations in the domain of "acquiring and using information." Id. at 46-49. It is, however, difficult to determine the basis for his conclusion that S.J.W. had a less than marked limitation in this domain, as this section of the decision contains little analysis and consists mostly of a disjointed recitation of evidence in the record. See id. In this section, the hearing officer highlighted, inter alia, the fact that Ms. Grasso-Megyeri, the speech/language pathologist who had evaluated S.J.W. in February 2010, had written in one of S.J.W.'s evaluations that he was "making very good progress" and was "reading more fluently." Id. at 47, 282. The hearing officer also discussed how S.J.W. was going to receive more services from a deaf and hard of hearing teacher, writing that it "appear[ed]" that S.J.W. would "likely make continued improvement with these increased services." Id. He summarized some of Ms. Scott's teacher questionnaire responses, which

23

indicated that S.J.W. had few significant problems in this area.
See id. at 48. The hearing officer also summarized some of
S.J.W.'s test scores, id. at 47-48, and attached a large degree
of significance to Ms. Grasso-Megyeri's overall positive
assessment of S.J.W.'s language skills, id. at 47. He attached
"significant weight" to Ms. Grasso-Megyeri's opinion because he
viewed it as consistent with some submissions from S.J.W.'s
teachers. Id. at 46. The hearing officer spent some time
summarizing Ms. Guerin and Ms. Kernan's evaluations of S.J.W.,
although the weight he accorded this evidence is not entirely
clear from the decision. See id. at 48-49. It does appear that
the hearing officer attached less significance to Ms. Guerin's
report relative to other indicators because Ms. Guerin observed
that S.J.W.'s low speech volume may have negatively affected his
intelligibility during part of her evaluation. See id. at 46,
48-49.

The hearing officer's determination that S.J.W. had less
than marked limitations in the domain of "attending and
completing tasks" was influenced by Ms. Scott's teacher
questionnaire. See id. at 50. On her questionnaire, Ms. Scott
indicated S.J.W. either had no problem or only a slight problem
with activities in this domain. Id. The hearing officer also
credited an assessment by S.J.W.'s first grade reading teacher
that while S.J.W. was "unfocused and silly" when he removed his

hearing aids, he was "very engaged" when he wore his hearing aids. Id. The hearing officer acknowledged that the school psychologist, Ms. Kernan's, evaluation of S.J.W. indicated that he was distractible and "required repeated directions and examples to facilitate his problem solving." Id. The hearing officer further acknowledged that scores received during this session "should be reviewed cautiously," because his "impulsivity and/or language/auditory processing difficulties impaired his ability to answer language-based questions correctly." Id.

For his analysis of the domain of "interacting and relating with others," the hearing officer again focused on Ms. Scott's questionnaire, which indicated that S.J.W. had no problem in this domain. Id. at 51. The hearing officer also considered other material from S.J.W.'s school which suggested that he was outgoing and got along with his peers. Id. at 51-52. From this evidence, the hearing officer concluded that S.J.W. had no limitation in this domain. Id. at 51.

To support his determination that S.J.W. had no limitation in the domain of "moving about and manipulating objects," the hearing officer observed that S.J.W.'s motor development milestones had been within normal limits and referenced Ms. Scott's opinion that S.J.W. had no problems in this domain. Id. at 52-53.

In his analysis of S.J.W.'s ability in the domain of "caring for yourself," the hearing officer referenced the results of the ABAS-II test administered by Ms. Kernan, which indicated that S.J.W. had adequate skills in "school living, health and safety, [and] self-care. . . ." Id. at 53. He also pointed to Ms. Scott's questionnaire, which indicated that S.J.W. had no difficulties in this area, and Ms. Grasso-Megyeri's report that his pragmatic language skills were age-appropriate. Id. at 54. The hearing officer closed his opinion with the observation that while Dr. Cevera diagnosed S.J.W. as suffering from moderately severe symmetric hearing loss, nevertheless S.J.W. had less than a marked limitation in the domain of his health and physical well-being. Id.

## IV. ANALYSIS

Walsh draws the Court's attention to three issues for review. First, she contends that the hearing officer committed legal error in failing to find that S.J.W.'s hearing loss met or medically equaled the listed impairment for hearing loss. Pl.'s Br. 12-16, ECF No. 10. Second, she argues that the hearing officer legally erred in failing to find that S.J.W. had a marked impairment in the domains of "acquiring and using information," "attending and completing tasks," and "interacting and relating with others." Id. at 17-22. Finally, Walsh alleges that the hearing officer's decision is not supported by

the substantial weight of the evidence and is therefore incorrect as matter of law.  Id. at 22-25.  Although Walsh's brief is somewhat opaque, the Court concludes that she contends that the decision was only against the substantial weight of the evidence in the three domains in which she also alleges the hearing officer's decision was legally erroneous.  See id. at 22-24; see also Compl. ¶¶ 21-22.  The Court reads Walsh's brief as conceding that the hearing officer's determination that S.J.W. has either no limitation or less than a marked limitation in the domains of "moving about and manipulating objects," "caring for yourself," and "health and physical well-being" was not against the substantial weight of the evidence.

**A.    The Treating Source Rule**

**1.    The Legal Background to the Treating Source Rule**

When determining a claimant's eligibility for disability benefits, a hearing officer must apply what is often called the "treating physician" rule.  See, e.g., Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008).  According to this rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record.'"  Id. (alteration in original) (quoting 20 C.F.R. § 404.1527(c)(2)).

Moreover, even when a treating physician's opinion is not given "controlling weight," it typically receives more weight from hearing officers than the opinion of a non-treating source. Smith ex rel. J.H. v. Colvin, 935 F. Supp. 2d 496, 504 (N.D.N.Y. 2013); see also 20 C.F.R. § 416.927(c)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be . . . able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from . . . consultative examinations . . . ."); Policy Interpretation Ruling Titles II & XVI: Giving Controlling Weight to Treating Source Medical Opinions, Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996) ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").

Under the treating physician rule, if a treating physician's opinion cannot be given controlling weight,

> the proper weight accorded [to it] depends upon several factors, including: '(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist.' [12]

---

[12] When assigning weight to a treating physician's opinion, a hearing officer will consider "[o]ther factors" in addition to those listed above.  20 C.F.R. § 416.927(c)(6).

Anderson v. Astrue, No. 07-CV-4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) (quoting Clark v. Commissioner of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998)).  A hearing officer must always "give good reasons in [his] notice of determination or decision for the weight [he] give[s] [the claimant's] treating source's opinion." 20 C.F.R. § 416.927(c)(2); see also Disarno v. Astrue, No. 06-CV-0461-JTC, 2008 WL 1995123, at *4 (W.D.N.Y. May 6, 2008) ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion . . . and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." (quoting SSR 96-2p, 1996 WL 1898704, at *5).  Remand may be necessary when the hearing officer fails to provide "good reasons" for his discounting of a treating physician's opinion.  Burgess, 537 F.3d at 129-30 (citing Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999)).  If a hearing officer does not give controlling weight to a claimant's treating physician, he must "explain the weight given to the opinions of state agency medical consultants."  Stytzer v. Asture, No. 1:07-CV-811 (NAM/DEP), 2010 WL 3907771, at *7 (N.D.N.Y. Sept. 30, 2010) (Mordue, C.J.); see also 20 C.F.R. § 416.927(e)(2)(ii).

The term "treating physician rule" is something of a
misnomer.  The rule applies to all medical opinions obtained
from "treating sources."  See Anderson, 2009 WL 2824584, at *9.
"Treating sources" are limited to the "acceptable medical
sources" defined in 20 C.F.R. § 416.913(a).  See id. (citing 20
C.F.R. § 416.913(a)).  "Treating sources" include:

> (1) Licensed physicians (medical or osteopathic
> doctors);
> (2) Licensed or certified psychologists. Included are
> school psychologists, or other licensed or certified
> individuals with other titles who perform the same
> function as a school psychologist in a school setting,
> for purposes of establishing intellectual disability,
> learning disabilities, and borderline intellectual
> functioning only;
> (3) Licensed optometrists . . . ;
> (4) Licensed podiatrists . . . ; and
> (5) Qualified speech-language pathologists, for
> purposes of establishing speech or language
> impairments only. For this source, "qualified" means
> that the speech-language pathologist must be licensed
> by the State professional licensing agency, or be
> fully certified by the State education agency in the
> State in which he or she practices, or hold a
> Certificate of Clinical Competence from the American-
> Speech-Language-Hearing Association.

20 C.F.R. § 416.913(a).

Dr. Merecki has been S.J.W.'s pediatrician since just after
birth, Admin. R. 260, and therefore he is a "treating source"
within the meaning of the regulation.  The hearing officer
acknowledges that Dr. Merecki was S.J.W.'s primary care
physician in his decision, though he does not term him a
treating source.  Id. at 43.  Ms. Guerin also appears to be a

treating source. The regulations explain that "treating

sources" include "[q]ualified speech-language pathologists" when

the pathologist's opinion is used to establish a claimant's

"speech or language impairment[]." 20 C.F.R. § 416.913(a)(5).

Ms. Guerin's qualifications are described as "CCC-SLP" at

several locations within the record, see e.g., Admin. R. 214,

218, and the hearing officer indicated her credential in his

decision, id. at 48. Qualified speech pathologists include,

inter alia, those who "hold a Certificate of Clinical Competence

from the American-Speech-Language-Hearing Association." 20

C.F.R. § 416.913(a)(5). Ms. Guerin's qualifications indicate

that she holds a Certificate of Clinical Competence in Speech-

Language-Pathology from the American-Speech-Language-Hearing

Association.[13] See How to Apply for Certification in Speech-

---

[13] The hearing officer did not analyze Ms. Guerin's
qualifications and did not evaluate her opinion in light of the
treating source rule. On the surface, however, the record
certainly appears to indicate that Ms. Guerin is a treating
source. Since failure to properly to apply the treating source
rule is legal error, remand for proper application of the rule
is appropriate. See Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir.
1998). As the hearing officer, not this Court, is the primary
factfinder, see Brault, 683 F.3d at 447-48, on remand the
hearing officer may make further evaluation of whether Ms.
Guerin holds a certificate from the American-Speech-Language-
Hearing Association or if her qualifications otherwise meet the
requirements of 20 C.F.R. § 416.913(a)(5), see Baldwin v.
Astrue, No. 07 Civ. 6958(RJH)(MHD), 2009 WL 4931363, at *23
(S.D.N.Y. Dec. 21, 2009) (observing a hearing officer's duty to
resolve uncertainty regarding whether an individual was a
licensed or certified speech pathologist).

<u>Language Pathology</u>, Am. Speech-Language-Hearing-Ass'n,
http://www.asha.org/certification/SLPCertification.htm (last
visited Mar. 18, 2014).  Moreover, while the record is not
entirely clear, it does appear that S.J.W. has been attending
speech therapy with Ms. Guerin for some time, and at the time of
the hearing he was receiving thrice weekly speech therapy
sessions.[14]  <u>See</u> Admin R. 215.

> **2. The Hearing Officer's Failure Properly to Apply the
> Treating Source Rule Necessitates Remand**

The hearing officer failed to "give good reasons" for the
weight he accorded to S.J.W's treating sources.  20 C.F.R. §
416.927(c)(2).  He appears entirely to have ignored the treating
source rule, although it is also possible that he considered it
but misapplied it.  Accordingly, this Court determines that the

---

[14] The controlling regulation states that speech-language
pathologists only qualify as treating sources when a claimant
has a speech or language impairment.  20 C.F.R. § 416.913(a)(5).
The hearing officer's decision only expressly refers to S.J.W.
as suffering from "moderately severe bilateral neural hearing
loss," Admin R. at 43, and did not state that he suffered from a
"speech or language impairment" <u>per se</u>.  In the section of his
decision where he described S.J.W.'s impairment, however, the
hearing officer referenced S.J.W.'s "delayed speech pattern" and
inability "to speak clearly." <u>Id.</u>  He also referenced S.J.W.'s
receipt of speech and language therapy. <u>Id.</u>  In view of the
hearing officer's emphasis of S.J.W.'s speech difficulties when
he described the nature of his impairment, it is appropriate to
view Ms. Guerin as a treating source. <u>See, e.g.</u>, <u>McIntosh ex
rel. TLA</u> v. <u>Commissioner of Soc. Sec.</u>, No. 12-cv-10361, 2012 WL
6966654, at *2 (E.D. Mich. Nov. 6, 2012) (treating speech-
language pathologist who tested child claimant's expressive and
receptive language abilities as an acceptable medical source for
the purpose of determining hearing and language limitations).

hearing officer's decision was based on legal error.  See Schaal
v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("We hold that the
Commissioner's failure to provide 'good reasons' for apparently
affording no weight to the opinion of plaintiff's treating
physician constituted legal error.")".  Remand is necessary so
that the treating source rule may properly be applied to the
analysis of three of S.J.W.'s functional domains.  See id.
(explaining that when the treating source rule is misapplied,
"the proper course is to direct that th[e] case be remanded . .
. to allow the [hearing officer] to reweigh the evidence").[15]

### a.  Dr. Merecki

While the hearing officer did not apply the treating source
rule to Dr. Merecki's submissions, reweighing this evidence in
light of the treating source rule might establish a marked
limitation in the domain of "interacting and relating with
others."  Two submissions from Dr. Merecki, S.J.W.'s

---

[15] The Court notes in passing that Ms. Kernan, the school
psychologist, is not a treating source.  The regulations state
that in some circumstances, school psychologists may be
considered treating sources.  20 C.F.R. § 416.913(a)(2).  School
psychologists, however, are treating sources "for purposes of
establishing intellectual disability, learning disabilities, and
borderline intellectual functioning only."  Id.  Although Walsh
has submitted evidence of S.J.W.'s poor performance on tests of
cognitive abilities, this was introduced for the purposes of
establishing his functional limitations.  She has acknowledged
that S.J.W. has never been diagnosed with a learning disability,
Admin. R. 77, and has not pursued benefits either before the
Commissioner or this Court under the theory that he suffers from
a learning or intellectual disability.

pediatrician, are found in the record. Both documents are consistent with S.J.W. having a marked limitation in this domain. The first submission from Dr. Merecki, an evaluation he completed for NYOTDA on January 6, 2010, states that S.J.W. has "temper tantrums out of frustration with not being able to hear," Admin R. 277, and describes S.J.W.'s sensory abilities, communication skills, and social/emotional skills as "delayed," id. 275-79. The second submission from Dr. Merecki, an evaluation of S.J.W.'s functional abilities completed on March 29, 2010, assesses S.J.W. as having a marked limitation in his social abilities stemming from his difficulties in communicating with others. Id. at 299.

It appears from the decision that the hearing officer failed to give proper consideration to Dr. Merecki's submissions. While the hearing officer referenced the January 2010 report in the introductory section discussing hearing loss, he did not reference Dr. Merecki's second submission in his decision. See id. at 43. Notably, in his assessment of S.J.W.'s abilities in the domain of "interacting and relating with others," the hearing officer did not mention or discuss either submission from Dr. Merecki, id. at 50-52, and concluded that S.J.W. had no limitations in this domain, id. at 51. Although in this section of his opinion he referenced other parts of the record which were consistent with his findings, see

34

<u>id.</u>, his failure even to acknowledge that S.J.W.'s pediatrician's opinion was in sharp conflict with his finding suggests that he did not consider Dr. Merecki's submissions at all when assessing S.J.W.'s limitations in this domain.  <u>See</u> <u>Johnson</u> v. <u>Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987) (holding that lack of "even [an] oblique reference to the treating physician rule" indicates that the hearing officer may have ignored the opinion of claimant's treating physician) (citation omitted). In the alternative, if the hearing officer considered Dr. Merecki's submissions, but then chose to discount them and credited other evidence in the record instead, he failed to comply with the treating physician rule because he did not "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion."[16]  <u>Burgess</u>, 537 F.3d at 129 (alteration in original) (quoting <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d 28, 33 (2d Cir. 2004)); <u>see</u> <u>Johnson</u>, 817 F.2d at 986.

### b.  Ms. Guerin

On October 7, 2010, Ms. Guerin, S.J.W.'s school speech-language pathologist evaluated S.J.W.'s speech and language abilities.  Admin. R. 214-18.  Her report provided evidence that

---

[16] In passing, the Court notes that while the hearing officer was, of course, required to apply the treating source rule when considering Dr. Merecki's opinion, he did not need to accord Dr. Merecki's opinion any special weight in the ultimate determination of whether S.J.W. was legally disabled.  20 C.F.R. § 416.927(d)(3).

indicated that S.J.W. has significant limitations in the domains of "acquiring and using information" and "attending and completing tasks." See id. Evaluating Ms. Guerin's submissions after proper application of the treating source rule might have resulted in a different finding regarding S.J.W.'s abilities in these domains.

Regarding the domain of "acquiring and using information," Ms. Guerin administered a number of tests to S.J.W., including the PPVT-4, the CELF-4, and the GFTA-2. Id. at 216-218. On the PPVT-4, which measures comprehension of the spoken word and vocabulary acquisition, S.J.W. scored in the fifth percentile. Id. at 216. On the GFTA-2, which evaluates speech articulation, S.J.W. scored in the eighth percentile. Id. at 217. The CELF-4 tests general language ability, on four of the five CELF-4 subtests,[17] S.J.W. scored below average, and on three of the five subtests S.J.W.'s scores placed him in the second percentile. See id. at 216-17. In addition to describing his test scores, Ms. Guerin's report contained written observations indicative of limitations in the domain of "acquiring and using information." Although she did make some positive observations about S.J.W.'s abilities in this domain, for instance noting that S.J.W.

---

[17] The "word classes" subcategory of the CELF-4 is divided into the "receptive" and "expressive" subclasses, which are both given individual scores. Admin R. 216. For the purposes of this discussion, the Court does not consider the total word classes category as a separate subclass.

currently articulates the "f" sound correctly ninety-four percent of the time in his speech therapy, and that he has "started to make progress" towards understanding grammatical structures, id. at 215, she described his receptive language skills as below average for children his age and related that he has difficulty with spatial and temporal concepts, id. at 216-17. Ms. Guerin wrote that when asked to recall sentences, S.J.W. "often substituted and omitted words from the sentence that changed the meaning of the sentence." Id. at 217. S.J.W. also struggled to explain simple relationships between objects in pictures shown to him. By way of example, Ms. Guerin observed that he described the relationship between a letter and a stamp as "notes."[18]  Id.

---

[18] In passing, the Court acknowledges that there is a line of cases holding that at least some psychological test scores are not "medical opinions," and therefore a hearing officer does not formally need to assign them weight or consider them under the treating source rule. See, e.g., Reid v. Astrue, No. 1:07-CV-0577(LEK), 2010 WL 2594611, at *6 (N.D.N.Y. June 23, 2010) (Kahn, J.) (noting IQ scores are not deemed to be opinion evidence); Miller v. Astrue, No. 3:07-CV-1093(LEK/VEB), 2009 WL 2568571, at *6 (N.D.N.Y. Aug. 19, 2009) (same). This circuit, however, has precedent treating the conclusions that a speech pathologist derives from a CELF-4 examination as a medical opinion. See Baldwin v. Astrue, No. 07 Civ. 6958(RJH)(MHD), 2009 WL 4931363, at *8, *25 (S.D.N.Y. Dec. 21, 2009). Moreover, even assuming that the conclusions Ms. Guerin drew from S.J.W.'s CELF-4 scores were not medical opinions and thus need not have been accorded weight, in her report Ms. Guerin made specific observations about the difficulties S.J.W. faces in language and following directions. These observations would fall within the treating source rule. See 20 C.F.R. § 404.1527(a)(2).

Ms. Guerin also indicated that S.J.W. had limitations in the domain of "attending and completing tasks," although she suggested that such limitations might be less severe than within the "acquiring and using information" domain. She explained that, on occasion, S.J.W. "needed to be redirected and reminded to maintain his attention to the task at hand" and that he has "difficulty following multistep directions." Id. at 128. On the other hand, at times her report minimized S.J.W.'s limitations in this domain; for instance she stated that S.J.W. was "easily redirected" when necessary, id. at 218, and that he was able to complete at least some of the tests she administered with "little prompting," id. at 217. She also wrote that S.J.W. was "very cooperative throughout all assessment tasks" and suggested that his ability to follow directions was a relative strength. Id. at 218.

Nothing in the hearing officer's decision indicates that he accorded Ms. Guerin's opinion the special consideration required of a treating source. When referencing Ms. Guerin's evaluation in his decision, the hearing officer did note that her credentials were "CCC-SLP," id. at 48, and referred to her report as a "reevaluation," id., but the decision does not indicate that the hearing officer was aware of the potential

ongoing relationship that Ms. Guerin had with S.J.W.,[19] id. at
215.  In his discussion of S.J.W.'s limitations in the domain of
"acquiring and using information," the hearing officer
summarized Ms. Guerin's October 9, 2010, evaluation, id. at 48-
49, but decided to give more weight to the report of Ms. Grasso-
Megyeri, a consulting speech pathologist, id. at 45-46.  The
hearing officer's explanation, described below, for the weight
that he gave to Ms. Guerin's report was cursory, id. at 48-49,
and was not the "comprehensive[]" analysis that it deserved as a
treating source.  See Burgess, 537 F.3d at 129 (quoting
Halloran, 362 F.3d at 33).  The hearing officer did not even
refer to Ms. Guerin's evaluation in his analysis of S.J.W.'s
limitations in the domain of "attending and completing tasks."
Admin. R. 50.

    Moreover, even if Ms. Guerin was not a treating source, the
hearing officer's reasoning for crediting Ms. Grasso-Megyeri's
report over Ms. Guerin's report constitutes legal error.
Apparently, the hearing officer had two reasons for crediting
Ms. Grasso-Megyeri over Ms. Guerin.  First, the hearing officer

---

[19] The record does not directly state that Ms. Guerin
conducted ongoing therapy with S.J.W., but it suggests as much.
Ms. Guerin's report indicates that S.J.W. was receiving therapy
three times a week, and then indicates that "he has warned up to
this clinician," and that he "seems to enjoy coming to speech
therapy and is always an active participant in each session."
Admin R. 215.  Such language indicates that Ms. Guerin has an
ongoing relationship with S.J.W

accorded "significant weight" to Ms. Grasso-Megyeri's evaluation
because Ms. Grasso-Megyeri's report was "consistent with
reports" from some of S.W.J.'s teachers. Id. at 46. Second,
the hearing officer apparently discounted Ms. Guerin's opinion
because in her report, Ms. Guerin wrote that at one point,
S.J.W. "spoke very low, which contributed to his decreased
intelligibility." Id.

It is correct that the weight accorded to a medical opinion
depends in part on its consistency with the record as a whole.
20 C.F.R. § 416.927(c)(4). The evidence from the two teachers,
however, is not consistent with Ms. Grasso-Megyeri's largely
positive evaluation of S.J.W.'s speech and language abilities.
One of the statements from S.J.W.'s teachers that the hearing
officer cited in support of Ms. Grasso-Megyeri's opinion was a
brief progress report stating that S.J.W. was "very responsive"
to receiving one-on-one instruction in sign language and that
the teacher "hop[ed] to see him utilize" sign language more
often. Admin. R. 46; see also id. at 232. The hearing officer,
moreover, alluded to another teacher's statement which merely
observed that S.J.W. would begin receiving more services from a
teacher for the death and hard of hearing. Id. at 46; see also
id. at 253. The Court fails to understand how these remarks
from S.J.W.'s teachers are consistent with Ms. Grasso-Megyeri's
opinion. The fact that S.J.W. might make more use of sign

language and will receive more services for the hard of hearing is immaterial to the degree of his underlying limitation in the domain of "acquiring and using information." See Archer ex rel. J.J.P. v. Astrue, 910 F. Supp. 2d 411, 426-47 (N.D.N.Y. 2012) ("[E]ven if [a] child can function normally while within the confines of the structured or supportive setting, the hearing officer must assess whether the child would be able to function adequately absent such assistance."). The same may be said about S.J.W.'s reported receptiveness to special services in a one-on-one setting.

The hearing officer also appears to have discounted the weight of Ms. Guerin's opinion because Ms. Guerin wrote in her report that S.J.W.'s "low speech volume[] negatively impacted his speech intelligibility." Admin. R. 217; see also id. at 46. Ms. Guerin's evaluation indicates, however, that S.J.W.'s low speech may have affected his performance on only one of the several tests she administered, the GFTA-2. Id. at 217. Nothing in the record indicates that her observations about S.J.W.'s difficulties would have been different had his volume of speech been higher, and Ms. Guerin stated that the results of her evaluation were a "reliable estimate of [S.J.W.'s] expressive and receptive language skills." Id. at 215. Therefore, Ms. Guerin's comment on S.J.W.'s speech volume cannot be a reason for discounting all of her opinion. If the hearing

41

officer believed that S.J.W.'s low speech volume during Ms.
Guerin's evaluation was somehow indicative of broader problems
with her opinion, he should have explained his reasoning. Thus,
even if the treating source rule did not apply, the hearing
officer's decision to credit Ms. Grasso-Megyeri's opinion over
Ms. Guerin's was error, as his explanation for the weight he
accorded to the two opinions was not supported by substantial
evidence.

> **c.    The Commissioner's Argument that the Holding
> of <u>Halloran</u> v. <u>Barnhart</u> Negates the Need for
> Remand is Incorrect**

The Commissioner argues that the Court does not need to
remand this case for the hearing officer to reconsider S.J.W.'s
limitations in the domain of "interacting and relating with
others" by applying the treating physician rule to Dr. Merecki's
submissions. Mem. Law Supp. Comm'r's Mot. J. Pleadings ("Comm'r
Br.") 14-16, ECF No. 12. The Commissioner relies on <u>Halloran</u> v.
<u>Barnhart</u>, 362 F.3d 28 (2d Cir. 2004) (per curiam), as support
for his contention that because the hearing officer acknowledged
other evidence in the record which was in conflict with Dr.
Merecki's opinion, the hearing officer's decision as a whole
"applied the substance of the treating physician rule." Comm'r
Br. 15 (citing <u>Halloran</u>, 362 F.3d at 32).

In <u>Halloran</u>, the Second Circuit reviewed a hearing
officer's decision denying an application for social security

42

benefits.  <u>Halloran</u>, 362 F.3d at 30.  The claimant in that case

argued that remand was necessary because the hearing officer had

not expressly acknowledged the treating physician rule when

rejecting the opinion of her treating physician.  <u>Id.</u> at 31.

Although the Second Circuit conceded that it was "unclear on the

face of the [hearing officer's] opinion whether the [hearing

officer] considered (or even was aware of) the applicability of

the treating physician rule," it upheld the hearing officer's

decision to deny benefits.  <u>Id.</u> at 32.  The Second Circuit held

that remand was unnecessary because its examination of the

record allowed it to conclude that "the substance of the

treating physician rule was not traversed" and that the claimant

had "received the rule's procedural advantages."  <u>Id.</u>

The Commissioner's reliance on <u>Halloran</u> fails for two

reasons.  First, he overstates the degree to which the evidence

in the record is inconsistent with Dr. Merecki's opinion.

Although the Commissioner correctly observes that much of the

record conflicted with Dr. Merecki's opinion that S.J.W.

suffered from a "marked" limitation in the domain of

"interacting and relating with others," Comm'r Br. 15, one key

piece of evidence which the hearing officer discounted suggests

that S.J.W. faces significant social difficulties.  When she

appeared before the hearing officer, Walsh highlighted S.J.W.'s

interpersonal problems, relating that S.J.W. had serious

conflicts with other children on his school bus, Admin. R. 73-
74, and got along "terribl[y]" with his brothers because of his
difficulty communicating with them, id. at 76.

Second, in Halloran, the Second Circuit could not determine
from the "face of [the hearing officer's] opinion" whether the
treating physician rule had been applied.  362 F.3d at 32.  In
that case, the hearing officer's decision at least contained
some analysis from which the Second Circuit could infer the
reason for discounting the treating physician's opinion.  Id.
The Halloran hearing officer specifically had written that the
treating physician's opinion was uninformative and did not
address a key question significant to the outcome of the case.
Id.  This fact was critical to the Second Circuit's ruling that
the hearing officer had "applied the substance of the treating
physician rule."  Id.

In contrast, the opinion of the hearing officer in
S.J.W.'s case completely ignored Dr. Merecki's second
submission.  In that report, Dr. Merecki opined that S.J.W.
suffered from a "marked" limitation in his social abilities.
Admin. R. 299.  Given that the hearing officer found that S.J.W.
had no limitations at all in the domain of "interacting and
relating to others," the Court considers it highly improbable
that the hearing officer would have neglected to mention the
second submission if he were aware of it.

44

Likewise, the hearing officer only discussed Dr. Merecki's first submission in the context of providing background on S.J.W.'s impairment. Id. at 43. When the hearing officer did refer to Dr. Merecki's first submission in his opinion, he wrote nothing indicating that he discounted its weight or probativeness. See id. In view of these considerations, the Court cannot conclude from this record that the hearing officer applied the "substance" of the treating physician rule to Dr. Merecki's submissions.

The Court observes that at the beginning of his decision, in the context of outlining the background law, the hearing officer wrote that he "ha[d] considered the opinion evidence in accordance with 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p." Id. at 44. Section 416.927 is the regulation outlining the treating source rule, and SSR 96-2p is a Social Security Ruling instructing hearing officers on the application of the treating source rule. These passing references appear to be decisional boilerplate and therefore are of no significance to this Court's review. See Ocasio v. Colvin, No. 12-CV-6002, 2013 WL 1395846, at *8 n.22 (E.D.N.Y. Apr. 5, 2013) (criticizing the use of boilerplate language in hearing officers' decisions). In view of the above analysis in this section, the Court concludes that the hearing officer did not apply the treating source rule

properly, despite his references to 20 C.F.R. § 416.927 and SSR
96-2p.

On remand, the hearing officer must reexamine the
submissions of Dr. Merecki and Ms. Guerin in light of the
treating source rule. After reevaluating these submissions, the
hearing officer must reconsider S.J.W.'s limitations in the
three functional domains of "acquiring and using information,"
"attending and completing tasks," and "interacting and relating
with others."[20]

### B. The Hearing Officer's Determination that Walsh's Testimony Was Not Credible Was Not Supported by Substantial Evidence

---

[20] The Court notes that the opinions of S.J.W.'s two
treating sources, Dr. Merecki and Ms. Guerin, are somewhat
inconsistent with each other. For instance, Dr. Merecki opined
that S.J.W. had a "marked" limitation in the domain of
interacting and relating with others, Admin. R. 299, whereas Ms.
Guerin's report suggests that S.J.W. has few, if any,
limitations in this domain, id. at 215-18. Ms. Guerin refers to
S.J.W. as "a silly, friendly, and cooperative little boy," and
writes that he has "warmed up" to her. Id. at 215. Conversely,
as discussed earlier, Ms. Guerin's submission evidences
limitations in the domain of "acquiring and using information,"
id. at 216-17, whereas in Dr. Merecki's first submission, he
indicated that S.J.W.'s cognitive skills were "age appropriate,"
id. at 278. These inconsistencies between the two treating
sources are potentially a reason for according them less weight
than they would otherwise receive. See Michels v. Astrue, 297
F. App'x 74, 75-76 (2d Cir. 2008) (holding that a hearing
officer was free to discount claimant's treating physicians'
opinions when those opinions were inconsistent with each other).
Remand is still necessary, however, because "it is up to the
agency, and not [a] court, to weigh the conflicting evidence in
the record." Clark v. Commissioner of Soc. Sec., 143 F.3d 115,
118 (2d Cir. 1998).

Walsh contends that the hearing officer's determination that her hearing testimony was not credible was not supported by substantial evidence. Pl.'s Br. 22-25. Because the hearing officer's rejection of Walsh's testimony resulted from his failure to apply the treating source rule, Walsh's contention is correct. On remand, the hearing officer should reevaluate the credibility of her testimony after applying the treating source rule to the opinions of Dr. Merecki and Ms. Guerin.

The hearing officer is responsible for determining a witness's credibility. Carroll v. Secretary of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) ("It is the function of the Secretary, not ourselves, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."), abrogated on other grounds, Sullivan v. Finkelstein, 496 U.S. 617, 626 (1990). When reviewing the Commissioner's decision to deny disability benefits, "[a] court must uphold the [hearing officer's] decision to discount a claimant's . . . subjective complaints if the finding is supported by substantial evidence." Frye ex rel. A.O. v. Commissioner of Soc. Sec., No. 5:10-CV-98 (GTS/ATB), 2010 WL 6426346, at *15 (N.D.N.Y. Nov. 12, 2010) (Baxter, M.J.) (citing 42 U.S.C. § 405(g) and Aponte v. Secretary, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984)). A hearing officer's determination of a witness's credibility "must be

consistent with the medical and other evidence." <u>Williams ex</u>
<u>rel. Williams</u> v. <u>Bowen</u>, 859 F.2d 255, 261 (2d Cir. 1988).  If a
hearing officer rejects the testimony of a witness, he must
explain his reasoning for rejecting the testimony "with
sufficient specificity to permit intelligible plenary review of
the record."  <u>Id.</u> at 261 (citing <u>Carroll</u>, 705 F.2d at 643).  In
cases like this one, where the claimant is a young child unable
to testify to his own symptoms, the hearing officer "must accept
the" testimony of his parent.  <u>Hamedallah ex rel. E.B.</u> v.
<u>Astrue</u>, 876 F. Supp. 2d 133, 151-52 (N.D.N.Y. 2012) (D'Agostino,
J.).

Walsh's testimony described S.J.W. as having limitations in
the domains of "acquiring and using information," "attending and
completing tasks," and "interacting and relating with others."
She testified to S.J.W.'s academic difficulties in school, which
she attributed to his hearing loss and speech delays.  Admin. R.
73, 78.  She related how during group activities at school,
S.J.W. "goes off into his own world" and will not stay on the
topic being discussed.  <u>Id.</u> at 79.  Walsh also described
S.J.W.'s difficulty completing work and staying on task without
supervision.  <u>Id.</u> at 78-79.  Although she acknowledged that
S.J.W. had friends, <u>id.</u> at 78-79, she stressed the problems he
faced when interacting with other children, which she claimed

stemmed from being unable to understand or communicate with members of his age group, id. at 79.

In his decision, the hearing officer observed several inconsistencies between Walsh's testimony and other evidence in the record. Id. at 45. Although the hearing officer's treatment of Walsh's testimony is not entirely clear, and he never used the word "credibility" or expressly assigned any weight to her testimony, id., the Court assumes that by mentioning parts of the record inconsistent with her testimony he was making an adverse finding of credibility. See F.S. v. Astrue, No. 1:10-CV-444 (MAD), 2012 WL 514944, at *19 (N.D.N.Y. Feb. 15, 2012) (D'Agostino, J.) ("One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the case record.").

The hearing officer mentioned three inconsistencies between Walsh's testimony and other evidence. First, he noted that Walsh, apparently relating what she had heard from S.J.W.'s audiologist, testified that S.J.W.'s "hearing isn't going to get better [and] we're just hoping it doesn't get any worse." Admin. R. 45, 81. He contrasted this with the opinion of Dr. Cevera, who described S.J.W.'s hearing loss as "moderately severe" and observed that he "get[s] some improvement with amplification." Id. at 45, 286. The hearing officer also found

her testimony to be inconsistent with Ms. Grasso-Megyeri's generally positive assessment of S.J.W.'s abilities. Id. at 45, 282-85. Second, the hearing officer explained that Walsh's statements about S.J.W. having difficulty interacting with other children conflicted with his school records and the reports of his teachers. Id. at 45. Third, the hearing officer suggested that Walsh had embellished the extent of the services S.J.W. received in school, writing that "[t]he claimant's mother alleged that he was classified as special education, but the record shows that in kindergarten he was in regular classes and he continues to be in regular classes with assistance in reading and speech therapy." Id.

The hearing officer's third reason for discounting Walsh's testimony, her reference to him being in "special education," is simply an inadequate reason for discounting her credibility in view of the entire record. It is true that Walsh twice referred to S.J.W. as being in "special ed." Id. at 72, 77. There is no indication at all, however, that she was attempting to embellish the extent of the services S.J.W. received or otherwise mislead the hearing officer when her testimony is considered in context. According to the hearing officer, Walsh's "allegation" that S.J.W. was "classified" as special education was inconsistent with the fact that he was in regular classes and received assistance in reading and speech therapy. Id. at 45. The first

time Walsh mentioned "special ed." was in response to the hearing officer's question as to what kind of school S.J.W. attended.  Walsh answered "[r]egular school with a lot of services; he's in special ed."  Id. at 72.  The hearing officer did not as a follow up question for more clarification.  Id.

The second time Walsh mentioned special education was in response to her attorney's question "[d]o you know what [S.J.W.'s] classification is [at school]?"  Id. at 77.  Walsh responded that S.J.W. was in "special ed. at the school," but then immediately followed that statement with "I'm not sure what you mean."  Id.  Neither her attorney nor the hearing officer explained the meaning of this question to her; instead her attorney proceeded with questions about the types of therapy S.J.W. received and whether he had been diagnosed with a learning disability.  Id. at 77-78.  Shortly before her attorney asked her about S.J.W.'s "classification," Walsh had described S.J.W.'s educational program, explaining how S.J.W. is sometimes in a regular classroom, but is pulled out to receive lessons in certain subjects or therapy.  Id. at 75-76.  Walsh had acknowledged that she was uncertain herself about the services S.J.W. received, stating, "I don't understand all of it, it's kind of new to me."  Id. at 76.

The Court observes that Walsh was accurate in her description of S.J.W.'s educational schedule.  S.J.W.'s

Individualized Education Program ("IEP") for the 2010-2011
school year indicates that S.J.W. is pulled out of his regular
classroom several times a week to receive speech therapy and for
lessons with a teacher for the deaf and hard of hearing. Id. at
220-21. S.J.W. also has English and math lessons with
consultant teachers in his regular classroom. Id. at 221. This
is consistent with Walsh's testimony that S.J.W. receives speech
and occupational therapy, is "pulled out the classroom a lot
throughout the day," and at one time received some type of
special reading services. Id. at 75-76.

The hearing officer faulted Walsh for referring to S.J.W.
as being "in" special education. The record, however, contains
numerous school documents which reference S.J.W.'s need for
special education. On the teacher questionnaire completed by
S.J.W.'s kindergarten teacher, Ms. Scott, she indicated that
S.J.W. received "special ed. services," id. at 160, although on
another page of the questionnaire, Ms. Scott checked a box which
indicated that he was not receiving special education
instruction, id. at 168. In a letter dated March 18, 2010, the
Supervisor of Special Education at S.J.W.'s kindergarten wrote
to Walsh and related to her that the Subcommittee on Special
Education had "recommended that [S.J.W.] be classified as a
student with a disability and receive special education
services." Id. at 173. Ms. Kernan's evaluation of S.J.W. was

for the Committee on Special Education's reevaluation purposes. Id. at 207. S.J.W.'s IEP for 2010-2011 describes S.J.W.'s speech therapy and meetings with the teacher for the deaf and hard of hearing under a heading entitled "Recommended Special Education Programs and Services" and refers to S.J.W. being evaluated by the Subcommittee on Special Education. Id. at 220-21. This document refers to S.J.W.'s time with consultant teachers as a "special education program[], and his speech therapy as a "related service." Id. at 220. Notably, the hearing officer referenced this last document in the same paragraph he found Walsh to lack credibility because she referred to S.J.W. as being classified as special education. Id. at 45.

Based upon this evidence, the Court determines that Walsh accurately described S.J.W.'s academic program to the hearing officer. S.J.W.'s educational records contain references to him participating in special education programs and being "classified" as "a student with a disability" who will "receive special education services." Id. at 173, 220-21. Thus Walsh's references to special education in her testimony and her other descriptions of S.J.W.'s education program do not make her a less than credible witness. The hearing officer's contrary finding is inexplicable in view of the fact that Walsh acknowledged that she did not completely understand S.J.W.'s

educational program, id. at 76, and that she told her attorney that she did not understand the question about "classification," id. at 77.

It also appears that the supposed inconsistencies of Walsh's testimony noted by the hearing officer were, in fact, largely consistent with the reports from S.J.W.'s treating sources. For instance, the hearing officer found an inconsistency between Walsh's statement that S.J.W.'s hearing loss may only worsen and Dr. Cevera's report that S.J.W. received "some improvement" from his hearing aids. Id. at 45, 286. The supposed inconsistency is unclear. It is possible for S.J.W. to receive a benefit from using his hearing aids and for his hearing to be incapable of further improvement. Moreover, the hearing officer also found Walsh's testimony on the extent of S.J.W.'s impairment to be inconsistent with Dr. Cevera's statement that S.J.W.'s hearing loss was "moderate." Id. at 45. Dr. Cevera's finding, however, is in conflict with the second submission from S.J.W.'s pediatrician, Dr. Merecki, who indicated that his hearing loss was "profound." Id. at 299.

The hearing officer apparently also gave less weight to Walsh's testimony because it was inconsistent with Ms. Grasso-Megyeri's assessment. Id. at 45. As discussed earlier, Ms. Grasso-Megyeri's assessment conflicts with the report of Ms. Guerin, a treating source. Further, the hearing officer

questioned Walsh's credibility because her testimony regarding S.J.W.'s social difficulties contrasted with teacher's reports. Id. at 45. In contrast to the reports of S.J.W.'s teachers, however, Dr. Merecki viewed the claimant as suffering from "marked" limitations in interacting with others. Id. at 299.

The hearing officer's reasons for finding Walsh to be an non-credible witness are not supported by the record. Because of the way the treating source rule was misapplied in this case, the Court cannot determine whether the hearing officer had "good reason" for the weight he accorded to the treating sources. 20 C.F.R. § 416.927(c)(2). Since the hearing officer's failure to apply the treating source rule was legal error, his finding that Walsh lacked credibility -- because her testimony was inconsistent with parts of the record which were themselves inconsistent with S.J.W.'s treating sources -- was an extension of that same legal error. Cf. Williams, 859 F.2d at 258 ("To determine on appeal whether [a hearing officer's] findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."). The Court concludes that the hearing officer's stated reasons for finding Walsh not credible either rested on legal error or were not supported by substantial evidence. On remand, after the hearing

officer correctly applies the treating source rule, he must revaluate the credibility of Walsh's testimony in light of the weight he accords to S.J.W.'s treating sources.

###### C. The Hearing Officer's Failure to Consider Whether S.J.W.'s Impairment Meets or Was Medically Equivalent to a Listed Impairment Was Legal Error

Walsh contends that the hearing officer committed reversible error when he failed to find that S.J.W.'s impairment met or was medically equivalent to a listed impairment. Pl.'s Br. 12. She argues that the evidence in the record establishes that S.J.W. meets or medically equals the listed impairment for hearing loss not treated with cochlear implantation, described at section 102.10(B)(3) of 20 C.F.R. Part 404, Subpart P, Appendix 1. See id.

When adjudicating an application for SSI, a hearing officer must consider whether the claimant's impairment meets a listed impairment. See Hickman ex rel. M.A.H. v. Astrue, 728 F. Supp. 2d 168, 173 (N.D.N.Y. 2010) (Mordue, C.J.). Moreover, if "the claimant's symptoms . . . appear to match those described in the Listings, the ALJ must provide an explanation as to why the claimant failed to meet or equal the Listings." Id. Remand may be necessary when a hearing officer's decision contains no discussion about whether a claimant's impairment meets the specifications of a similar listed impairment. See Aponte, 728 F.2d at 592-93; Hickman, 728 F. Supp. 2d at 175.

The Court agrees with Walsh that the hearing officer's lack of analysis of a relevant listed impairment was legal error. On remand, the hearing officer must reconsider whether S.J.W.'s symptoms are medically equivalent to Listing 102.10(B)(3). Listing 102.10(B) defines when a child between five and eighteen years of age will be found to be disabled because of hearing loss which is not treated with a cochlear implant. It explains that a child is disabled when he has, "[a]n average air conduction hearing threshold of 50 decibels or greater in the better ear and a marked limitation in speech or language." 20 C.F.R. pt. 404, subpt. P, app. 1, § 102.10(B). For a child five years of age or older, the Commissioner determines the claimant's average air conduction hearing threshold by averaging his hearing thresholds at 500, 1000, 2000, and 4000 Hz. Id. § 102.00(B)(2)(f). The regulations describe a child as having a "marked limitation" in speech if:

> (i) Entire phrases or sentences in [his] conversation are intelligible to unfamiliar listeners at least 50 percent (half) of the time but no more than 67 percent (two-thirds) of the time on [his] first attempt; and

> (ii) [His] sound production or phonological patterns (the ways in which [he] combine[s] speech sounds) are atypical for [his] age.

Id. § 102.00(B)(5)(a). Likewise, a child will be considered to have a "marked limitation" in language if his "current and valid test score on an appropriate comprehensive, standardized test of

overall language functioning is at least two standard deviations below the mean" and the evidence in the record indicates that his daily communication functioning is consistent with his test score. Id. § 102.00(B)(5)(b).

The record contains two audiograms of S.J.W.'s hearing. The first was created by Lauren Marino, M.A., CCC-A ("Ms. Marino"), on February 23, 2010, for review by Dr. Cevera in his examination. Admin. R. 286-88. The second was created by S.J.W.'s audiologist, Dr. Winderl, on November 23, 2010. Id. at 362. Both audiograms suggest that S.J.W.'s average air conduction hearing threshold is sufficiently close to the 50-decibel cut-off necessary to satisfy section 102.10(B). Id. at 288, 362. On the first audiogram, S.J.W.'s hearing in his right ear tested slightly better than his hearing in his left ear, id. at 288, and in the second audiogram, his hearing in his left ear appears to be slightly stronger than in his right ear, id. at 362. Both audiograms, however, indicate very similar results.

In the first audiogram, created by Ms. Marino, in which S.J.W.'s hearing was stronger in his right ear, S.J.W.'s air conduction hearing threshold for this ear was somewhat less than 50 decibels at 500 Hz, perhaps approximately 45 decibels. Id. at 288. At 1000, 2000, and 4000 Hz, his hearing threshold was exactly 50 decibels. Id. Therefore, the average of S.J.W.'s hearing thresholds at 500, 1000, 2000, and 4000 Hz must have

been close to, but less than, the 50 decibel cut-off for Listing 102.10(B)(3) on the date of this test.  See id.

On the second audiogram, created by Dr. Winderl, in which S.J.W.'s hearing was stronger in his left ear, the claimant's air conduction hearing threshold was 40 decibels at 500 Hz, 50 decibels at 1000 and 2000 Hz, and somewhat less than 50 decibels at 4000 Hz, perhaps about 45 decibels.  Id. at 362.  Like on the first audiogram, the second audiogram indicates that S.J.W.'s average air conduction hearing threshold in his better ear, his left, approaches, but is less than, the 50-decibel cut-off.  See id.

Although S.J.W.'s average air conduction hearing threshold approaches the section 102.10(B) cut-off, the hearing officer dismissed the possibility that S.J.W.'s hearing loss might meet or medically equal the listing in a single, conclusory sentence in his decision.  Id. at 43.  The hearing officer's lack of analysis was legal error.  See Aponte, 728 F.2d at 592-93; Hickman, 728 F. Supp. 2d at 175 ("The [hearing officer] should have provided some explanation as to why claimant's impairments do not meet the criteria of the specified listings . . . .  The [hearing officer]'s failure to explain her conclusion is plain error.").

The Court observes, however, that the evidence in the record does not support Walsh's claim that S.J.W.'s impairment

59

meets Listing 102.10(B)(3).  For a child's audiogram to

establish hearing loss which meets section 102.10(B), the

child's hearing must be measured without hearing aids.  20

C.F.R. pt. 404, subpt. P, app. 1, § 102.00(B)(2)(b).  In her

brief, Walsh states that S.J.W. was wearing hearing aids when

the audiograms in the record were created.  Pl.'s Br. 14.

Therefore, she argues that his average unaided hearing threshold

must be greater than the results reported on the audiograms,

exceeding the 50-decibel threshold under section 102.10(B).  Id.

Walsh's contention is incorrect.  The audiograms in the record

are of tests of S.J.W.'s hearing when he was not wearing his

hearing aids.  When Ms. Marino tested S.J.W.'s hearing to create

the first audiogram, she also recorded S.J.W.'s aided hearing on

the same graph.  Admin. R. 288.  As would be expected, the graph

shows the hearing threshold for S.J.W.'s aided air conduction to

be lower at all frequencies than his unaided hearing threshold.

Id.  Ms. Winderl did not expressly state that she had evaluated

S.J.W.'s hearing without hearing aids.  Id. at 362.  The

audiogram she produced, however, was very similar to the first

audiogram.  See id. at 288, 362.  In view of the large degree of

similarity between the two audiograms, it is apparent that Ms.

Winderl also conducted her test when S.J.W. was not wearing his

hearing aids.  As the audiograms measure S.J.W.'s hearing

unaided, they demonstrate that S.J.W.'s average air conduction

hearing threshold is less than 50 decibels.  Walsh, in fact,

admits that the audiograms indicate that the claimant's hearing

threshold is "approximately 48 to 49 decibels."  Pl.'s Br. 14.

Therefore, S.J.W.'s hearing loss is close to, but falls short

of, the requirements of Listing 102.10(B)(3).  See Sullivan v.

Zebley, 493 U.S. 521, 530 (1990) ("For a claimant to show that

his impairment matches a listing, it must meet all of the

specified medical criteria.  An impairment that manifests only

some of those criteria, no matter how severely, does not

qualify.") (emphasis omitted), superseded by statute on other

grounds, 42 U.S.C. § 1382c(a)(3)(C); Johnson, 817 F.2d at 986

("[W]here application of the correct legal principles to the

record could lead to only one conclusion, there is no need to

require agency reconsideration.").

The Commissioner invokes the authority of Berry v.

Schweiker, 675 F.2d 464 (2d Cir. 1982).  See Comm'r Br. 9.  In

Berry, the Second Circuit upheld a hearing officer's

determination that the claimant's impairment did not meet or

medically equal a listed complaint, despite the hearing

officer's failure to provide any analysis to support his

findings, because the court was "able to look to other portions

of the [hearing officer's] decision and to clearly credible

evidence in finding that his determination was supported by

substantial evidence."  675 F.2d at 468-69.  This holding allows

a reviewing court to uphold a hearing officer's rejection of listed impairments if the court is convinced that the hearing officer's conclusion was supported by substantial evidence. See Lusher ex rel. Justice v. Commissioner of Soc. Sec., No. 7:05-CV-1110, 2008 WL 2242652, at *6 (N.D.N.Y. May, 29, 2008) (Hurd, J.) (holding that even though the hearing officer failed to provide more than a cursory explanation of the listed impairments, "[t]his failure, while unfortunate, does not preclude the court from upholding the ALJ's decision provided it is convinced that the ultimate conclusion is supported by substantial evidence in the record."); Brown ex rel. S.W. v. Astrue, No. 1:05-CV-0985 (NAM/RTF), 2008 WL 3200246, at *12 (N.D.N.Y. Aug. 5, 2008) (Mordue, C.J.) ("Although it is preferable that the [hearing officer] address a specific Listing, failure to do so is not reversible error if the record supports the overall conclusion.").

Here, the Commissioner makes a strong argument that S.J.W. cannot meet any of the requirements of section 102.10(B). See Comm'r Br. 8-9. The hearing officer's total lack of analysis is problematic here, however, in light of the fact that there is evidence in the record suggesting that S.J.W. may meet the second prong of the listing. The second prong of section 102.10(B) is met when a child claimant has "a marked limitation in speech or language." 20 C.F.R. pt. 404, subpt. P, app. 1, §

102.10(B)(3).  A child will be found to have a "marked" limitation in language when he has a "current and valid test score on an appropriate comprehensive, standardized test of overall language functioning at least two standard deviations below the mean" and his "daily communication functioning [is] consistent with [the] test score."  Id. § 102.00(B)(5)(b).  When Ms. Guerin administered the CELF-4 to S.J.W. on October 7, 2010, he scored in the second percentile on three of the five CELF-4 subtests.[21]  Admin. R. 216–17.

As remand is necessary in this case for other reasons, on remand the hearing officer should also reevaluate whether S.J.W.'s impairment medically equals Listing 102.10(B)(3).  Cf. Turner v. Barnhart, No. 05-3509, 2006 WL 2460876, at *3 (E.D. Pa. Aug. 21, 2006).

## V.  CONCLUSION

Walsh contends that the hearing officer's findings that S.J.W. had a less than marked limitation in the functional domains of "acquiring and using information," "attending and completing tasks," and "interacting and relating with others," were not supported by substantial evidence.  Pl.'s Br. 22-24. As this matter is remanded for proper application of the

---

[21] The CELF-4 is described in the record as a test of "a student's general language ability."  Admin. R. 216.  S.J.W. did better on two of the CELF-4 subtests, scoring well above average on one subtest.  Id. at 217.  The record does not indicate his overall score on the CELF-4.

treating source rule, for reevaluation of Ms. Walsh's testimony in light of that rule, and to determine if S.J.W.'s impairment medically equals section 102.10(B)(3), the Court will not preemptively analyze the substantiality of the evidence the hearing officer relied upon in his decision.

The Court notes in passing, however, that while the hearing officer's decision is lengthy and cites many pieces of the record, it contains minimal analysis. After an outline of relevant law, most of the decision consists of a recitation of evidence in the record, both supporting and contrary to the hearing officer's findings, with no explanation of the weight he gave to particular pieces of evidence. This style of decision-writing makes it difficult for a court to determine whether substantial evidence supports a hearing officer's conclusions. See, e.g., Rivera v. Astrue, No. 10 CV 4324(RJD), 2012 WL 3614323, at *12 (E.D.N.Y. Aug. 21, 2012).

On remand, the hearing officer must consider the opinions of Dr. Merecki and Ms. Guerin in light of the treating source rule. The hearing officer must also reevaluate the credibility of Ms. Walsh and reevaluate whether S.J.W.'s impairment medically equals section 102.10(B)(3). The hearing officer may, if he chooses to, examine Ms. Guerin's credentials to determine whether she qualifies as a treating source.

For the foregoing reasons, it is hereby ordered that the

Commissioner's determination is REVERSED and REMANDED for

further administrative proceedings consistent with this

opinion.[22]

**SO ORDERED.**


                                    /s/ William G. Young
                                    WILLIAM G. YOUNG
                                    DISTRICT JUDGE

---

[22] Compare this case with <u>Veiga</u> v. <u>Colvin</u>, Civil Action No. 13-10013-WGY (D. Mass. Mar. 25, 2014), issued this same day by this judge, but sitting in the District of Massachusetts within the First Circuit. Both this decision and that are "right" in light of the controlling precedent in the respective courts of appeal. Yet any fair-minded observer would conclude that review is far more lenient to the Social Security Administration in the First Circuit and far more rigorous in the Second. Such disparate intercircuit jurisprudence is something of a reproach to courts charged with interpreting a national statute of such broad administrative and judicial importance.